# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF OHIO
# WESTERN DIVISION AT DAYTON

| | | |
|---|---|---|
| BRENDA VANCE, | : | |
| Plaintiff, | : | |
| | | Case No. 3:08cv00398 |
| vs. | : | |
| | | District Judge Walter Herbert Rice |
| MICHAEL J. ASTRUE, | : | Magistrate Judge Sharon L. Ovington |
| Commissioner of the Social | | |
| Security Administration, | : | |
| Defendant. | : | |

## REPORT AND RECOMMENDATIONS[1]

## I. INTRODUCTION

Plaintiff Brenda Vance applied for Disability Insurance Benefits (DIB) claiming that she was under a "disability" within the meaning of the Social Security Act beginning on December 31, 2002. Plaintiff's DIB application was denied during an early stage of administration review (Tr. 47), and she apparently did not seek further administrative review. (Doc. #8 at 1).

In April 2004 Plaintiff filed applications for DIB and Supplemental Security Income (SSI). She again asserted that she was under a "disability" beginning on December 31, 2002. (Tr. 67). Plaintiff's applications were denied at all stages of administrative review including, most significantly, by Administrative Law Judge (ALJ) Melvin A. Padilla, who concluded that Plaintiff was not under a "disability" and was therefore not eligible to receive DIB or SSI. (Tr. 19-37). This Court has jurisdiction in this case to review ALJ Padilla's decision. *See* 42 U.S.C. §§405(g), 1383(c)(3).

---

[1] Attached hereto is NOTICE to the parties regarding objections to this Report and Recommendations.

The case is before the Court upon Plaintiff's Statement of Errors (Doc. #8), the Commissioner's Memorandum in Opposition (Doc. #10), the administrative record, and the record as a whole.

Plaintiff seeks an Order remanding this case to the Social Security Administration to correct certain errors.

The Commissioner seeks an Order affirming the ALJ's decision.

## II.   FACTUAL BACKGROUND

### A.   Plaintiff and Her Testimony

On the date Plaintiff's claimed disability began, and during other pertinent times, she was under age fifty and thus considered to be a "younger person" for social security purposes. *See* 20 C.F.R. §404.1563 (C); 416.963 (C).[2] She has a high school education, which included some special education classes. (Tr. 105).

Over the years Plaintiff worked primarily as a cashier and a factory worker (temporary placements), and she performed janitorial work. (Tr. 100).

Plaintiff's claimed disabilities are both mental and physical, including bipolar disorder II with psychotic features and problems with her knees. *See* Tr. 99. She testified during the ALJ's hearing that she is unable to work because she hears voices telling her to do different things, and she does not want to hurt anybody. (Tr. 667). She explained that the voices are with her all the time, especially if she does not take her medications. (Tr. 667-68). When she is not on medications, the voices get worse. (Tr. 668). When asked if counseling and medications help with her emotional problems, she answered, "Yes. My medication has good control over it, the little, my voices and my paranoia. But, again I still go through it." (Tr. 671).

---

[2] The remaining citations to the Regulations will identify only the pertinent DIB Regulations, with full knowledge of the corresponding SSI Regulations. *See Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007).

2

In 2003 Plaintiff stopped working at a McDonald's restaurant because "voices were telling [her] to do real bad things and stuff...," and she "threw grease on someone ... [a] co-worker." (Tr. 682). When asked about being around others, Plaintiff testified, "I just feel, I don't like to be around them because [I] feel like I'm going to hurt them or something or something bad [is] going to happen, or I'm going to do something bad to them or something I don't want ... because I had done it in the past...." (Tr. 683-84).

Plaintiff also experiences "a lot of paranoia" when she leaves her house and sometimes when she is at home. *Id*. She leaves her house about three times per week to go grocery shopping or attend church or go to the doctor. (Tr. 668).

Plaintiff testified that she has problems with fluid on both her knees, and she has swelling in her ankles due to eczema. (Tr. 672). She needed to wear a knee brace at times, which sometimes helped. (Tr. 673). She also has pain in the middle of her back "mostly every other day..." (Tr. 673-74). It is a throbbing pain, and she has worn a back brace, which sometimes helped. (Tr. 674). Although at one point she took prescription pain relievers (e.g., Vicodin) for pain relief, at the time of the ALJ's hearing she was taking extra strength Tylenol instead. (Tr. 675).

Plaintiff has pain in her right shoulder, "all down [her] neck." (Tr. 676). She testified, "it's in my fingers and hands and arms and stuff...." *Id*. She testified that she could probably not lift any amount of weight because her hands were stiff and numb. (Tr. 678). She has problems climbing stairs due to knee pain. *Id*. She does limited household activities, sometimes vacuuming, doing laundry, dusting, or watching television. When she goes grocery shopping, she does not go alone; someone must take her. (Tr. 679, 683). She has no hobbies. Seven years before the ALJ's hearing, she had used cocaine, but – to her credit – she completed substance abuse treatment. (Tr. 681, 684). Since then, she had not used cocaine and she did not have any other drug problem. (Tr. 684).

Plaintiff underwent gastric bypass surgery in July 2006 and eventually lost 174 pounds. (Tr. 665). During her recovery from surgery, she sometimes missed counseling

3

appointments at Eastway Behavioral Healthcare. (Tr. 664-65, 670-71, 684). Other than those missed counseling appointments, she always went to her counseling appointments. (Tr. 684).

### B. Additional Evidence

**1.**

In March 2003 – slightly more than three years before her gastric bypass surgery – Dr. Wunder examined Plaintiff at the request of the Ohio Bureau of Disability Determinations (Ohio BDD). Dr. Wunder's diagnostic impressions included left shoulder pain with some impingement and a possible rotator cuff repair. Dr. Wunder noted Plaintiff's complaint of right hand pain, but he could not identify any abnormalities. She had bilateral knee pain likely due to "chronic strain from her morbid obesity , and she likely does have some early degenerative abnormalities." (Tr. 178). Plaintiff reported right foot pain; Dr. Wunder noted, "The cause is undetermined." *Id*. Dr. Wunder further wrote:

> She self reports functional capacities in at least light ranges. Because of her morbid obesity and complaints of knee pain, I doubt that she could stand 8 hours a day, and she should have the opportunity to rest periodically. She could not do any significant overhead activities with the left arm and could not do any significant lifting with the left arm.

(Tr. 178-79).

In 2004 a record-reviewing physician, Dr. Congbalay, opined that Plaintiff could lift 20 pounds occasionally and 10 pounds frequently; she could stand and/or walk 6 hours in an 8-hour workday; and she could sit about 6 hours in an 8-hour workday. (Tr. 236).

In August 2004 a psychologist, Dr. Lewin, reviewed the record and concluded that a diagnosis of Schizoaffective Disorder, Bipolar Type was warranted. (Tr. 249-64). Dr. Lewin opined that Plaintiff was moderately restricted in her activities of daily living; she had moderate difficulties in maintaining social functioning, and she moderate difficulties

4

in maintaining concentration, persistence, or pace. (Tr. 262). Dr. Lewin also wrote, in part, "The claimant is capable of comprehending, remembering and carrying out simple instructions. The claimant can make simple decisions, maintain attention, adhere to a schedule, and relate appropriately to coworkers and supervisors. The claimant can adapt to a setting in which duties are routine." (Tr. 251). Dr. Lewin noted on another form that Plaintiff met the diagnostic criteria for Schizoaffective Disorder, Bipolar Type, and borderline intellectual functioning. (Tr. 256).

**2.**

In August 2004 a psychologist, Dr. Bonds, met with Plaintiff and evaluated her at the request of the Ohio BDD. Dr. Bonds diagnosed Plaintiff with Schizoaffective Disorder and mild mental retardation.[3] (Tr. 246). Her then-current GAF[4] was 41, indicating a person with "serious symptoms ... or any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)...." Diagnostic and Statistical Manual of Mental Disorders, 4th ed., Text Revision at p. 34. Dr. Bonds explained:

> To determine Brenda's Global Assessment of Functioning Scale score, the degree of symptom severity and functional abilities must be assessed and rated. In terms of symptoms severity, Brenda has depressed mood, feelings of anxiety, low energy level, poor judgment and reasoning

---

[3] Dr. Bonds cited "295.70" in support of his diagnosis. (Tr. 246). This undoubtedly refers to the diagnostic criteria in §295.70 of the Diagnostic and Statistical Manual of Mental Disorders (DSM-IV), *see* Tr. 25, the current version of which generally describes Schizoaffective Disorder as involving "an uninterrupted period of illness which, at some time, there is a Major Depressive, Manic, or Mixed Episode concurrent with symptoms that meet Criterion A for Schizophrenia.... In addition, during the same period of illness, there have been delusions or hallucinations for at least 2 weeks in the absence of prominent mood symptoms...." Diagnostic and Statistical Manual of Mental Disorders, 4th ed., Text Revision at p. 319.

[4] "GAF," Global Assessment Functioning, is a tool used by health-care professionals to assess a person's psychological, social, and occupational functioning on a hypothetical continuum of mental illness. It is, in general, a snapshot of a person's "overall psychological functioning" at or near the time of the evaluation. *See Martin v. Commissioner*, 61 Fed.Appx. 191, 194 n.2 (6th Cir. 2003); *see also* Diagnostic and Statistical Manual of Mental Disorders, 4th ed., Text Revision at 32-34.

5

> abilities and very low intellectual abilities and memory functioning. Her functional abilities are severely limited. Brenda has severe impairment in her ability to live independently and main her own household. She has very limited academic and work skills. She is also very limited in her ability to relate to people and maintain relationships. Based upon the degree of symptom severity and functional abilities her current GAF is in the severe range between 41 and 50. Her current GAF is 41.

(Tr. 246). According to Dr. Bonds, Plaintiff's ability to understand, remember, and follow directions was severely limited. (Tr. 247). She was moderately limited in her ability to relate to peers, supervisors, or the public and in her ability to withstand the pressure and stress of day-to-day work activities. (Tr. 247). Dr. Bonds noted, "Brenda has depressed mood, is sometimes still paranoid and suspicious of people. She withdraws and stays to herself." *Id.* And Dr. Bonds opined, "Because of Brenda's very poor social judgment and reasoning, her impaired memory, depressed and unstable moods, she would have difficulty handling demands for speed, accuracy and productivity, for getting along with other workers and for dealing with changes in the workplace." *Id.*

Nearly three years later (in May 2007) Dr. Bonds met again with Plaintiff and evaluated her at the request of the Ohio BDD. (Tr. 583-95). Dr. Bonds again diagnosed Plaintiff with Schizoaffective Disorder, Bipolar Type in partial remission, and borderline intellectual functioning. (Tr. 589). Dr. Bonds explained, in part, "In terms of symptom severity, Brenda does not currently have any significant problems with depression, anxiety, or thought disorder. She has a history of mood swings, auditory and visual hallucinations, problems with controlling her anger, acting out aggressively, and exercising poor judgment and reasoning abilities. Her cognitive abilities appear to be below average, though not as low as her test scores seem to suggest.. Her functional abilities are moderately limited." (Tr. 589). Dr. Bonds reported Plaintiff's IQ test results as: Verbal IQ 65, Performance IQ 63, Full Scale IQ 61. (Tr. 588).

Dr. Bonds also completed a form indicating his opinions that Plaintiff had no limitation in her ability to understand and remember simple directions or to carry out

6

simple directions; she was moderately impaired in her ability to carry out complex instructions and in her ability to make judgments on complex work-related decisions. Dr. Bonds further opined that Plaintiff was mildly impaired in her ability to interact appropriately with others in the workplace, and she was moderately impaired in her ability to withstand workplace stress due to her "below average capabilities, emotional instability and impaired judgment." (Tr. 593)

Dr. Bonds noted that Plaintiff spent four years living at the Lodge, which, he noted, is Eastway Behavioral's "housing for those with mental illness." (Tr. 583).

**3.**

The administrative record contains slightly more than 200 pages of records from Eastway Behavioral documenting her treatment from April 2004 to June 2005 (Tr. 279-489), and additional Eastway Behavioral treatment records from June 2006 to June 2007 (Tr. 632-55).

Plaintiff's initial psychiatric evaluation at Eastway Behavioral was done in May 2004 by Dr. Shepard. Plaintiff reported a history of hallucinations. (Tr. 469-73). She noted she was isolated and lonely, and she slept poorly. She had occasional suicidal ideation. She heard voices telling her to hurt herself and had racing thoughts at times. (Tr. 469). Dr. Sheppard diagnosed Plaintiff with Schizoaffective Disorder, Bipolar Type, under 295.70 of the DSM. (Tr. 471). Her GAF was 35 (Tr. 471), indicating, "[s]ome impairment in reality testing or communication ... or a major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood...." DSM-IV-TR at p. 34. She was taking several prescription medications (Seroquel, Geodon, and Lexapro). (Tr. 470).

One month later, in April 2004, a licensed social worker, presumably Plaintiff's mental health counselor, wrote a brief note stating, "Client is unable to independently manage mental health, financial, housing, medical needs." (Tr. 484).

In early July 2004 Plaintiff met with Dr. Shepard, who noted that she was oriented

7

times four and "fairly clean for being homeless." (Tr. 454). By the end of July 2004 Plaintiff obtained placement in The Lodge. (Tr. 443). Plaintiff's treatment at The Lodge involved counseling and with group therapy. *E.g.*, Tr. 423-41. In November 2004 Plaintiff saw Dr. Shepard. She exhibited some paranoia but was otherwise doing ok. (Tr. 323). Dr. Shepard increased her dosage of Topomax to help with her symptoms of irritability. (Tr. 323).

Plaintiff reported increased paranoia and hallucinations in September 2006. She was starting to isolate herself from others. (Tr. 511). She saw Dr. Sheppard in May 2007; he had not seen her since February 2006. (Tr. 635). Dr. Sheppard noted that Plaintiff had undergone gastric bypass surgery and had lost 170 pounds since her last visit fifteen month earlier. (Tr. 635). She was still experiencing some auditory hallucinations and paranoia. (Tr. 635). Dr. Shepard noted that she was "not on meds," and he started her on Ativan, Lexapro, and Risperdal. (Tr. 635).

### III.   ADMINISTRATIVE REVIEW

#### A.   "Disability" Defined and the Sequential Evaluation

The definition of the term "disability" is essentially the same for both DIB and SSI. *See Bowen v. City of New York*, 476 U.S. 467, 469-70 (1986). Narrowed to its statutory meaning, a "disability" includes only physical or mental impairments that are both "medically determinable" and severe enough to prevent the applicant from (1) performing his or her past job and (2) engaging in "substantial gainful activity" that is available in the regional or national economies. *See Bowen*, 476 U.S. at 469-70 (1986). A DIB/SSI applicant bears the ultimate burden of establishing that he or she is under a disability. *See Key v. Callahan*, 109 F.3d 270, 274 (6th Cir. 1997); *see Wyatt v. Secretary of Health and Human Services*, 974 F.2d 680, 683 (6th Cir. 1992); *see also Hephner v. Mathews*, 574 F.2d 359, 361 (6th Cir. 1978).

Social Security Regulations require ALJs to resolve a disability claim through a

five-Step sequential evaluation of the evidence. *See* Tr. 23-31; *see also* 20 C.F.R. §§404.1520(a)(4), 416.920(a)(4).[5] Although a dispositive finding at any Step terminates the ALJ's review, *see also Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007), if fully considered, the evaluation answers five questions:

1. Has the claimant engaged in substantial gainful activity?

2. Does the claimant suffer from one or more severe impairments?

3. Do the claimant's severe impairments, alone or in combination, meet or equal the criteria of an impairment set forth in the Commissioner's Listing of Impairments (the Listings), 20 C.F.R. Subpart P, Appendix 1?

4. Considering the claimant's residual functional capacity, can the claimant perform his or her past relevant work?

5. Considering the claimant's age, education, past work experience, and residual functional capacity, can the claimant perform other work available in the national economy?

*See* 20 C.F.R. §416.920(a)(4); *see also Colvin*, 475 F.3d at 730; *Foster v. Halter*, 279 F.3d 348, 354 (6th Cir. 2001).

### B. The ALJ's Decision

ALJ Padilla conducted the required five-step sequential evaluation, concluding as follows:

Step 1: Plaintiff had not engaged in substantial gainful activity since her claimed disability onset date, December 31, 2002.

Step 2: Plaintiff suffered from the severe impairments of obesity with reduction in weight secondary to gastric bypass surgery in May 2006; mild to moderate bilateral knee osteoarthritis; bipolar disorder; possible borderline intellectual functioning; and a history of cocaine abuse in remission.

---

[5] The remaining citations will identify the pertinent SSI Regulations with full knowledge of the corresponding DIB Regulations.

Step 3:      Plaintiff did not have an impairment or combination of impairments that met or equaled an impairment in the Listings.

Step 4:      The ALJ assessed Plaintiff's Residual Functional Capacity as follows:

> After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to: lift up to twenty pounds occasionally and ten pounds frequently; climbing stairs, balancing, stooping, kneeling, crouching, and crawling are limited to occasionally; she must avoid reaching or lifting overhead; climbing ladders, scaffolds, or working at unprotected heights; and she is limited to unskilled, simple tasks not involving extended periods of concentration; and low stress jobs that are not fast paced, have no production quotas, and do not involve inherently stressful or hazardous activities. Therefore, she is limited to a reduced range of light work.

Step 4:      Plaintiff could not perform any past relevant work.

Step 5:      Plaintiff could perform a significant number of jobs existing in the national economy.

As a result of the ALJ's findings throughout the sequential evaluation, he concluded that Plaintiff was not under a disability and not eligible for DIB or SSI. (Tr. 19-37).

## IV.   JUDICIAL REVIEW

Judicial review of an ALJ's decision determines whether substantial evidence in the administrative record supports the ALJ's factual findings. *Bowen v. Comm'r. of Soc. Sec.*, 478 F.3d 742, 745-46 (6th Cir. 2007). "Substantial evidence is defined as 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Bowen*, 478 F3d at 746 (citing in part *Richardson v. Perales*, 402 U.S. 389, 401 (1977)). It consists of "more than a scintilla of evidence but less than a preponderance..." *Rogers v. Comm'r. of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007). Judicial review for substantial evidence is deferential not *de novo*. *See Cruse v. Commissioner of Social Sec*. 502 F.3d 532, 540 (6th Cir. 2007); *see also Cutlip v.*

*Secretary of Health and Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994). The Court's agreement or disagreement with the ALJ's findings plays no role in the substantial evidence review, and no significance attaches to contrary evidence in the record – if other substantial evidence supports the ALJ's findings. *Rogers*, 486 F.3d at 241; *see Her v. Comm'r. of Soc. Sec.*, 203 F.3d 388, 389-90 (6th Cir. 1999).

Reviewing for substantial supporting evidence is not the stopping point of judicial analysis. Courts also examine the administrative decision to determine whether the ALJ applied the correct legal criteria. *See Bowen*, 478 F.3d at 746. If the ALJ did not, the decision may not be upheld even when substantial evidence supports the ALJ's findings. *See id.* For example, a decision will not be upheld where the ALJ failed to apply the standards mandated by the Social Security Regulations and where that failure prejudices a claimant on the merits or deprives the claimant of a substantial right. *See Bowen*, 478 F.3d at 746 (and cases cited therein). Through *Bowen* and other recent Sixth Circuit cases, an ALJ's failure to apply the correct legal criteria – at least when evaluating medical source opinions – mandates further judicial review for harmless error. *Bass II v. McMahon*, 499 F.3d 506, 512 (6th Cir. 2007); *see Bowen*, 478 F.3d at 747-49; *see also Wilson*, 378 F.3d at 547-49 (offering examples of possible *de minimis* errors). Consequently, if the ALJ erred by not applying the correct legal criteria but the error was harmless, the decision should be affirmed. *See Bass II*, 499 F.3d at 512 (and cases cited therein).

V. **DISCUSSION**

    A. **The Parties' Contentions**

Plaintiff contends, in part, that Plaintiff is limited in her ability to work around others and the ALJ erred by failing to find any such limitation. Plaintiff argues that the ALJ erred by not evaluating Dr. Bonds' 2004 opinions or the opinions of Dr. Lewin and by instead relying primarily on Dr. Bonds' 2007 opinions. Plaintiff also contends that the ALJ erred in failing to evaluate Dr. Wunder's opinions as required by the

Commissioner's Regulations and Rulings.

The Commissioner argues that the ALJ "adequately accommodated her substantiated complaints." (Doc. #10). The Commissioner further contends that the ALJ noted both of Dr. Bonds' reports and properly relied on the opinions of Dr. Lewin.

As to the ALJ's decision regarding Dr. Wunder's opinions, the Commissioner contends that the ALJ did not err because Dr. Wunder had no objective data on which to base his opinion that Plaintiff could not stand 8 hours a day due to morbid obesity and knee pain. The Commissioner further contends that the ALJ's assessment of Plaintiff's residual functional capacity at a modified range of light work was consistent with Dr. Wunder's opinions and Dr. Congbalay's opinions.

### B.     **Medical Source Opinions**

Although the record contains many treatment records from Eastway Behavior, including certain records of psychiatrist Dr. Sheppard, the record does not contain the opinions of treating medical source regarding her mental or physical work abilities. The current review of the ALJ's decision thus focuses on his evaluation of the non-treating medical sources opinions.

The Commissioner views non-treating medical sources "as highly qualified physicians and psychologists who are experts in the evaluation of the medical issues in disability claims under the [Social Security] Act." Social Security Ruling 96-6p, 1996 WL 374180 at *2. Yet the Regulations do not permit an ALJ to automatically accept (or reject) the opinions of a non-treating medical source. *See id*. at *2-*3. The Regulations explain, "In deciding whether you are disabled, we will always consider the medical opinions in your case record together with the rest of the relevant evidence we receive." 20 C.F.R. §404.1527(b). To fulfill this promise, the Regulations require ALJs to evaluate non-treating medical source opinions under the factors set forth in §404.1527(d) including, at a minium, the factors of supportability, consistency, and specialization. *See* 20 C.F.R. §404.1572(f); *see also* Ruling 96-6p, 1996 WL 374180 at *2-*3.

C.  **Analysis**

When assessing Plaintiff's residual functional capacity, the ALJ indicated that he evaluated the medical source opinions "in accordance with the requirements of 20 CFR 404.1527 and 416.927 and SSRs [Social Security Rulings] 96-2p, 96-5p and 96-6p." (Tr. 30). The ALJ was correct in his citations to these pertinent Regulations and Rulings as providing the foundational legal criteria for the evaluation of medical source opinions. Yet the ALJ's conclusory statement alone merely confirms, at most, what this Court presumes: that the ALJ understands the legal criteria applicable to the evaluation of the medical source opinions. This Court's review must go further by determining whether the ALJ actually applied the correct legal criteria to the evaluation of medical source opinions. *See Bowen*, 478 F.3d at 746 ("This court will uphold the Commissioner's decision if it is supported by substantial evidence and if the Commissioner applied the correct legal criteria.").

A review of the ALJ's decision reveals that he did not evaluate the opinions of Dr. Bonds, Dr. Lewin, or Dr. Wunder under the legal criteria mandated by the Regulations. Although he described the medical records, including Dr. Bonds' reports in detail, *see* Tr. 31-35, this part of the ALJ's decision does not describe or apply the required regulatory factors. *See id*. This constituted a failure to apply the correct legal criteria because the Regulations and Rulings required the ALJ to weigh the opinions of one-time examining physicians and record-reviewing physicians under the regulatory factors, including supportability, consistency, and specialization. *See* 20 C.F.R. §404.1527(d), (f); *see also* Social Security Ruling 96-6p, 1996 WL 374180 . The Regulations, moreover, appear to emphasize this requirement by reiterating it no less than three times. *See* 20 C.F.R. §404.1527(d) ("we consider all of the following factors in deciding the weight to give any medical opinion...."); *see* also 20 C.F.R. §404.1527(f)(ii) (factors apply to opinions of state agency consultants); 20 C.F.R. §404.1527(f)(iii) (same as to medical experts' opinions); Social Security Ruling 96-6p, 1996 WL 374180 at *2 (same). Indeed, as to

13

stage agency consultants – like Drs. Bond and Lewin – the Regulations state, "Unless the treating source's opinions is given controlling weight, the administrative law judge must explain in the decision the weight given to the opinions of a State agency medical or psychological consultant..., as the administrative law judge must do for any opinions from treating sources, nontreating sources, and other nonexamining sources who do not work for us." 20 C.F.R. §404.1527(f)(2)(ii).

The Commissioner's Rulings likewise explain the significance of applying the required regulatory factors when evaluating the opinions of state agency medical consultants, like Drs. Bond and Lewin. Ruling 96-6p states, in part:

> [T]he opinions of State agency medical and psychological consultants and other program physicians and psychologists can be given weight only insofar as they are supported by evidence in the case record, considering such factors as the supportability of the opinion..., the consistency of the opinion with the record as a whole, including other medical opinions, and any explanation for the opinion provided by the State agency medical or psychological consultant or other program physician or psychologist. The adjudicator must also consider all other factors that could have a bearing on the weight to which an opinion is entitled, including any specialization of the State agency medical or psychological consultant.

Soc. Sec. R. 96-6p, 1996 WL 374180 at *2.

The ALJ also erred in his rejection of the diagnosis of Schizoaffective Disorder by Dr. Sheppard, Dr. Bonds, and Dr. Lewin. The ALJ explained, "While schizoaffective disorder has been diagnosed, there is no objective evidence of psychotic features or indication that she was ever anything but well oriented, alert, and logical thinking." (Tr. 34). This constituted error for two reasons. First, the ALJ did not rely on a medical source opinion disagreeing with the diagnosis of schizoaffective disorder provided by Drs. Sheppard, Bonds, and Lewis and he instead relied on his own lay interpretation of certain isolated notes appearing in Plaintiff's many treatment records. This constituted error. "[A]n ALJ must not substitute his own judgment for a physician's opinion without relying on other evidence or authority in the record." *Clifford v. Apfel*, 227 F.3d 863, 870

(7th Cir. 2000).[6] Second, the ALJ improperly required objective medical evidence to support the medical sources' diagnosis of Schizoaffective Disorder, Bipolar Type.

> In general, mental disorders cannot be ascertained and verified as are most physical illnesses, for the mind cannot be probed by mechanical devices ... in order to obtain objective clinical manifestations of mental illness.... [W]hen mental illness is the basis of a disability claim, clinical and laboratory data may consist of the diagnosis and observations of professionals trained in the field of psychopathology. The report of a psychiatrist should not be rejected simply because of the relative imprecision of the psychiatric methodology or the absence of substantial documentation, unless there are other reasons to question the diagnostic techniques.

*Blankenship v. Bowen*, 874 F.2d 1116, 1121 (6th Cir. 1989) (quoting *Poulin v. Bowen*, 817 F.2d 865, 873-74 (D.C. Cir. 1987)(other citation omitted).

For the above reasons, the Commissioner's contention that the ALJ properly evaluated the opinions of Drs. Bond and Lewin lacks merit. Although the Commissioner does not specifically raise the possibility that the ALJ's errors were harmless, this possibility remains. *See Wilson*, 378 F.3d at 545-46. Yet a review of the opinions provided by Drs. Bonds and Lewin does not assist the Commissioner.

"A court cannot excuse the denial of a mandatory procedural requirement protection simply because, as the Commissioner urges, there is sufficient evidence in the

---

[6] *See Meece v. Barnhart*, 2006 WL 2271336, *8 (6th Cir. 2006)("the ALJ may not substitute his own medical judgment for that of the treating physician where the opinion of the treating physician is supported by the medical evidence); *see also Rosa v. Callahan*, 168 F.3d 72, 78-79 (2nd Cir. 1999)("[T]he ALJ cannot arbitrarily substitute his own judgment for competent medical opinion."); *Hamlin v. Barnhart*, 365 F.3d 1208, 1217 (10th Cir. 2004)(ALJ improperly rejected treating physician's opinion "because of the ALJ's own credibility judgments, speculation or lay opinion."); *Winfrey v. Chater*, 92 F.3d 1017, 1022 (10th Cir. 1996)("the ALJ clearly overstepped his bounds when he substituted his medical judgment for that of Dr. Spray..."); *Balsamo v. Chater*, 142 F.3d 75, 81 (2nd Cir. 1998)("In the absence of a medical opinion to support the ALJ's finding as to Balsamo's ability to perform sedentary work, it is well-settled that the ALJ cannot arbitrarily substitute his own judgment for competent medical opinion.... [W]hile an [ALJ] is free to resolve issues of credibility as to lay testimony or to choose between properly submitted medical opinions, he is not free to set his own expertise against that of a physician who [submitted an opinion to or] testified before him." (internal citation omitted)); *Gonzalez v. Apfel*, 113 F.Supp.2d 580, 590 (S.D.N.Y. 2000) (same).

15

record for the ALJ to discount the treating source's [or nontreating source's] opinion and, thus, a different outcome on remand is unlikely. '[A] procedural error is not made harmless simply because the [aggrieved party] appear to have had little chance of success on the merits anyway.' To hold otherwise, and to recognize substantial evidence as a defense to non-compliance with §1527(d)(2), would afford the Commissioner the ability to violate the regulation with impunity and render the protections promised therein illusory. The general administrative law rule, after all, is for a reviewing court, in addition to whatever substantive factual or legal review is appropriate, to 'set aside agency action ... found to be ... without observance of procedure required by law.'" *Wilson*, 378 F.3d at 546 (brackets added)(internal citations omitted). Although the Sixth Circuit has left open the issue of whether a *de minimis* violation of the procedural requirements of §404.1527(d)(2) can constitute harmless error, a review of the reports provided by Dr. Bond in 2004 and 2007 and the report provided by Dr. Lewin does not reveal that their opinions are "so patently deficient that the Commissioner could not possibly credit..." them. *Wilson*, 378 F.3d at 547.

Accordingly, Plaintiffs' contention that the ALJ's decision is not supported by substantial evidence because the ALJ erred when evaluating the opinions provided by Drs. Bond and Lewin is well taken.

## VI. REMAND IS WARRANTED

Plaintiff does not seek a judicial award of benefits, but she does seek a remand to the Social Security Administration. (Doc. #8 at 18-19).

Under sentence four of 42 U.S.C. § 405(g), the Court has authority to affirm, modify, or reverse the Commissioner's decision "with or without remanding the cause for rehearing." *Melkonyan v. Sullivan*, 501 U.S. 89, 99 (1991). Remand is appropriate if the Commissioner applied an erroneous principle of law, failed to consider certain evidence, failed to consider the combined effect of impairments, or failed to make a credibility finding. *Faucher v. Secretary of H.H.S.*, 17 F.3d 171, 176 (6th Cir. 1994).

Remanding this case for further consideration is warranted in light of the above-described errors by the ALJ. On remand the ALJ should be instructed to conduct the regulatory required five-step sequential evaluation, and in so doing, to evaluate the medical source opinions of record as required by the Commissioner's Regulations and Rulings.

### IT IS THEREFORE RECOMMENDED THAT:

1. The Commissioner's final non-disability decision be vacated;

2. No finding be made regarding whether Plaintiff is under a "disability" within the meaning of the Social Security Act'

3. This matter be remanded to the Social Security Administration under Sentence Four of 42 U.S.C. §405(g) for further proceedings consistent with this Report and Recommendations, and any decision adopting this Decision; and

4. The case be terminated on the docket of this Court.


November 12, 2009                                    s/Sharon L. Ovington
                                                     Sharon L. Ovington
                                                United States Magistrate Judge

### NOTICE REGARDING OBJECTIONS

Pursuant to Fed. R. Civ. P. 72(b), any party may serve and file specific, written objections to the proposed findings and recommendations within ten days after being served with this Report and Recommendations. Pursuant to Fed. R. Civ. P. 6(e), this period is extended to thirteen days (excluding intervening Saturdays, Sundays, and legal holidays) because this Report is being served by mail. Such objections shall specify the portions of the Report objected to and shall be accompanied by a memorandum of law in support of the objections. If the Report and Recommendations are based in whole or in part upon matters occurring of record at an oral hearing, the objecting party shall promptly arrange for the transcription of the record, or such portions of it as all parties may agree upon or the Magistrate Judge deems sufficient, unless the assigned District Judge otherwise directs. A party may respond to another party's objections within ten days after being served with a copy thereof.

Failure to make objections in accordance with this procedure may forfeit rights on appeal.  *See United States v. Walters,* 638 F.2d 947 (6th Cir. 1981); *Thomas v. Am,* 474 U.S. 140 (1985).